

*Attachment 1*

RECEIVED FOR FILING

JAN - 8 2024

JEFFERSON COUNTY CLERK

**SUPERIOR COURT FOR THE STATE OF WASHINGTON**
**IN AND FOR THE COUNTY OF JEFFERSON**

| | |
|---|---|
| SARAH BONES, in her Personal Capacity, and as Personal Representative of the Estate of JOSHUA BONES, deceased; C.G., a minor, by and through his Guardian, SARAH BONES; and T.G., a minor, by and through his Guardian, SARAH BONES,<br><br>Plaintiffs,<br><br>vs.<br><br>H.I.G. CAPITAL, LLC; WELLPATH; COUNTY OF CLALLAM, WASHINGTON, a Political Subdivision of the State of Washington;  BILL BENEDICT; DON WENTZEL; TYLER CORTANI; LETICIA RUBALCAVA; KRISTIN MICHELLE PUHL; ALICIA C. LONG; EDWARD S. BERETTA; LINSEY JANE MONAGHAN; TAMARA VANOVER; KATHERINE E. JONES; and JOHN DOES 1-10,<br><br>**Defendants**. | No.  24-2-00009-16<br><br>**COMPLAINT FOR DAMAGES**<br>**DEMAND FOR JURY TRIAL** |

**COME NOW** the above-named Plaintiffs, SARAH BONES, C.G., and T.G.,  by and through their counsel, Joseph Schodowski of Schodowski Law, Inc., PS, and Ryan Dreveskracht of Galanda Broadman, PLLC, and by way of claim allege upon personal

COMPLAINT FOR DAMAGES - Page 1

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

knowledge as to themselves and their own actions, an upon information and belief upon all other matters, as follows:

### I. PARTIES

**A.    PLAINTIFFS**

1.      JOSHUA R. BONES is an individual who was needlessly killed by Defendants' acts and omissions. Plaintiff SARAH BONES is Joshua's wife. She brings these claims in her personal capacity and as the Personal Representative of the Estate of Joshua R. Bones.

2.      C.G. and T.G., minors, are the children of Sarah Bones and stepchildren of Joshua Bones. All plaintiffs are residents of Clallam County, Washington, and at all material times hereto, were residents of Clallam County, Washington.

**B.    CLALLAM COUNTY DEFENDANTS**

3.      Defendant CLALLAM COUNTY is a public entity, duly organized and existing under the laws of the State of Washington. Under its authority, Defendant CALLAM COUNTY operates and manages Clallam County Jail ("Jail"), and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures and practices/customs of the Clallam County Sheriff's Department, and its respective employees, agents, and subcontractors. The Clallam County Sheriff's Department operates the Jail and is and was responsible for ensuring the provision of emergency and basic medical and mental health care services to all Jail inmates. Defendant CALLAM COUNTY has authority to sue and be sued, to purchase and make contracts, to dispose of and resolve legal actions and tort claims, to provide for jails and corrections, and to operate and/or be responsible for Clallam County health facilities, such as its jails through contracts, joint

COMPLAINT FOR DAMAGES - Page 2

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

ventures, or partnerships. The Clallam County Sheriff's Department is a governmental department fully funded and overseen by Defendant CLALLAM COUNTY. As such, Defendant CLALLAM COUNTY is responsible for all deputy training, discipline, hiring, firing, maintaining deputy and staff records, and to taking corrective actions as it affects the Clallam County Sheriff's Department and its jails, prisoners and pretrial detainees, and deputy officers and staff.

4.    CLALLAM COUNTY entered into a contract with Defendant WELLPATII (acquired by Defendant H.I.G.) to provide through its employees, agents, and representatives medical, dental and mental health care to CLALLAM COUNTY jails. In this respect, WELLPATH / H.I.G., through its executives, officers, leadership, employees, agents, and representatives, provide a governmental function and stand in the same capacity as CLALLAM COUNTY in carrying out their duties at the Jail. CLALLAM COUNTY, jointly with WELLPATH / H.I.G., was and is responsible to develop joint policies and procedures affecting the mentally ill in custody and to provide continuity of care from the time a detainee is booked until they are released. CLALLAM COUNTY was and is responsible for overseeing that WELLPATH / H.I.G. staff complies with their contractual medical responsibilities to prisoner's mental health care.

5.    Defendant BILL BENEDICT is the Sheriff of Clallam County who supervised the Jail at the time of Joshua's injuries. As the final policymaker, he was responsible for ensuring the presence of and implementing of proper policies, procedures, and training. Defendant Benedict was also responsible for the training, supervision, and discipline of Jail employees and/or agents, including the individually named defendants and Does 1 through 10.

COMPLAINT FOR DAMAGES - Page 3

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

6.     Defendant DON WENTZEL is the chief corrections deputy who supervised the Jail at the time of Joshua's injuries. He was delegated the authority of ensuring the presence and implementing of proper policies, procedures, and training. Defendant Wentzel was also responsible for the training, supervision, and discipline of Jail employees and/or agents, including the individually named defendants and Does 1 through 10.

7.     Defendants BENEDICT and WENTZEL shall hereinafter be identified as "Policymaking Defendants" collectively.

8.     Defendants TYLER CORTANI; LETICIA RUBALCAVA; KRISTIN MICHELLE PUHL; ALICIA C. LONG; EDWARD S. BERETTA; LINSEY JANE MONAGHAN; TAMARA VANOVER; KATHERINE E. JONES ("Defendants" collectively) are employees or subcontractors of Clallam County. These Defendants knew that Joshua was (1) suicidal; (2) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement. These Defendants were negligent; deliberately indifferent; and/or acted in furtherance of an official and/or de facto policy or procedure of deliberate indifference.

9.     JOHN and JANE DOES No. 1-10 are subcontractors, employees, and /or agents of Clallam County. These Defendants Doe knew that Joshua was (1) suicidal; (2) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement. These Defendants were negligent; deliberately indifferent; and/or acted in furtherance of an official and/or de facto policy or procedure of deliberate indifference.

C.     **H.I.G.'S DEFENDANTS**

10.     Defendant WELLPATH arose from the ashes of private-equity-owned Correct

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

Care Solutions ("CCS").[1]

11.    As provided in a 2017 Leadership Newsletter of its investors:



**Correct Care Solutions, Nashville, TN**
*Executive Chairman: Jerry Boyle*
*CEO: Jorge Dominicis*
*Platform Acquisition: December 2012 | Recent Transaction: September 2017*

In December 2012, GTCR acquired Correctional Healthcare Companies, Inc. ("CHC"), a leading outsourced healthcare provider to correctional facilities. The CHC investment opportunity grew out of GTCR's proactive efforts targeting a range of healthcare cost-containment opportunities.

In July 2014, CHC merged with Correct Care Solutions ("CCS"), a portfolio company of Audax Management and Frazier Healthcare Ventures. The combination of CCS and CHC created a strong player in the growing public jails segment of the market and one of the largest companies in the outsourced correctional healthcare industry. The combined company leverages the scale of its infrastructure and clinical capabilities in order to capitalize on the continuing trend toward outsourcing. The combined company operates under the CCS name and is led by CCS founder and Executive Chairman Jerry Boyle and CEO Jorge Dominicis.

12.    CCS' rise to infamy was described by radio station WBUR:

The juggernaut of the jail health care industry was started by . . . Jerry Boyle. . . . Boyle had seen how bad health care could be in jail. He started as a prison guard and rose through the ranks to superintendent of Bridgewater State Hospital in the late 1980s to early 1990s. . . . Boyle would parlay his 15 years of corrections experience into a second career in the private jail health care business — this time for profit. He first led a company called Prison Health Services, which had the Suffolk jail contract in the early 2000s and later became part of Corizon Health. Clients around the country followed him to his next company, Correct Care Solutions. Boyle attracted private equity backers, including Boston-based Audax Group, that saw prison medicine as ripe for cost savings and potential investment payoffs.[2]

13.    Meanwhile, CCS continued to rack up an appalling body count. A June 2019

investigation by CNN reported that CCS had "been sued for more than 70 deaths" over the

---

[1] CCS was acquired by Audax Group, Frazier Healthcare Partners, and GTCR in 2017.

[2] https://www.wbur.org/news/2020/03/24/jail-health-companies-profit-sheriffs-watch

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

previous five years.[3] Another 2019 investigation in The Atlantic revealed that CCS "had been sued at least 1,395 times in federal courts over the past decade."[4]

14.     On October 1, 2018, Defendant H.I.G. CAPITAL, LLC ("H.I.G."), a private equity firm doing business in Washington State, announced the acquisition of CCS, creating a partnership with management to be headquartered in Nashville Tennessee under the name "Wellpath." Defendant WELLPATH continued to be run by Boyle, and boasted expectations to "generate about $1.5 billion annually."[5]

15.     As late as May of 2019, Defendant WELLPATH referred to Boyle as a "visionary" founder on its website, stating that the company had "adopted his management philosophy as our company's values." In 2022, Boyle was sentenced to three years in prison for conspiring to commit fraud by paying bribes to secure contracts.

16.     Boyle and WELLPATH's "management philosophy" operated like this: Local, state, and federal government bodies operate on a fixed budget each year. Contracted medical providers providing fixed-price contracts allow governments to lock in pricing for the provision of healthcare to inmates, which is preferable for budgetary purposes. And the competitive bidding process awards the lowest bidder. Once awarded the contract, the provider is entitled to keep all of the money it is awarded, regardless of services provided. Profit for Defendants H.I.G. and WELLPATH is then achieved by providing less, or no care.

---

[3] https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/

[4] https://www.theatlantic.com/politics/archive/2019/09/private-equitys-grip-on-jail-health-care/597871/

[5]     https://www.bizjournals.com/nashville/news/2018/11/07/one-of-nashvilles-largest-private-companies-merges.html

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

17.     For example, Defendant WELLPATH has a policy and custom of not providing care to inmates with rapidly approaching release dates because, according to WELLPATH's former Director of Nursing, "[i]f they have a medical problem and are released, then the financial responsibility falls on the shoulders of someone else."

18.     To provide another example, Defendant WELLPATH also has a policy and custom not attempting to diagnose and monitor life-threatening illnesses and chronic diseases, denying urgent emergency room transfers, not treating serious psychiatric disorders, and allowing common infections and conditions to become fatal.

19.     In sum, as aptly expressed by a number of U.S. Senators in a recent letter to Defendants HIG CAPITAL and WELLPATH: "[a] host of federal investigations, press reports, and reports by incarcerated people have revealed apparent deficiencies in Wellpath's care."[6]

20.     H.I.G./WELLPATH and their employees, supervisors, directors, managers have a unity of ownership and unity of purpose and interest that extends to all WELLPATH providers of health care in all county jails where they does business. A bird's eye view of other jurisdictions is demonstrative of their unconstitutional practices, customs, and policies in Clallam County that resulted in Mr. Bones' death (described in detail below):

a.      In *Sauls v. Cnty. of Lasalle* it was sufficiently alleged that "Wellpath has a 'custom or practice' of failing to adequately treat patients at risk of suicide" and that this custom and practice caused the suicide death of an inmate. No. 22-255, 2023 WL 4864985 (N.D. Ill. July 31, 2023).

---

[6] https://www.warren.senate.gov/imo/media/doc/2023.12.18%20Wellpath%20letter1.pdf

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

b.       In *Moore v. Wellpath* it was sufficiently alleged that the overall "lack of care leading to [an inmate]'s suicide was the result of multiple failures to act by multiple individuals employed by Wellpath" and that "allegations of repeated institutional failures states a plausible claim of deliberate indifference by Wellpath." No. 20-11154, 2023 WL 1111509 (E.D. Mich. Jan. 30, 2023).

c.       In *Norman v. Wellpath, LLC*, the court found that Wellpath employs a policy that "fails to account for detainees with urgent medical needs," which plausibly resulted in an inmate's death. No. 19-2095, 2022 WL 1516262 (D. Or. May 13, 2022).

d.       In *Seybold v. Tazewell Cnty.*, the plaintiff plausibly alleged "a policy of not sending individuals . . . to the hospital and not appropriately assessing or providing treatment for inmates who exhibited signs of bizarre behavior" due to "financial incentives." No. 20-1386, 2022 WL 68385 (C.D. Ill. Jan. 6, 2022).

e.       In *Miller v. Cnty. of Sutter* the plaintiffs asserted, for example, "that HIG and Wellpath were aware their doctors and nurses were treating more and more individuals with acute mental health diagnosis and substance use disorders"; that "more than ninety people have died of suicide or a drug overdose while in the custody of a jail served by Wellpath"; that "[g]rand juries in other counties have criticized Wellpath for how it handles prisoner detoxification, have found the company's procedures failed to detect people at risk for alcohol withdrawal, and have concluded drug and alcohol withdrawal played key roles in three deaths"; that "Wellpath has faced repeated complaints of inadequate mental healthcare"; and that "mortality rates are fifty percent

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

1  higher in jails managed by Wellpath than in other jails." No. 22-577, 2020 WL 6392565

2  (E.D. Cal. Oct. 30, 2020).

3      21.     At all material times, Defendant WELLPATH was and is owned and controlled

4  by H.I.G. Capital. Defendant WELLPATH acts on behalf of H.I.G. and was and is responsible

5  for the hiring, retaining, training, and supervising of the conduct, policies and practices of its

6

7  employees and agents of the WELLPATH, including DOES 11-20.

8      22.     WELLPATII executives, directors, supervisors and managers, physicians,

9  nurses, LPNs, and mental health providers act on behalf of H.I.G. and WELLPATH. H.I.G. is

10  the alter ego of WELLPATH, and/or alternatively WELLPATH acts on behalf of H.I.G., who

11

12  have control over it.

13      23.     H.I.G. accomplishes this *inter alia*, by placing its in-house professional and

14  expertise as board members of WELLPATH to ensure its control over WELLPATH. There is

15  unity of interest and ownership such that the separate personalities of H.I.G. and WELLPATH

16  no longer exist as WELLPATH and their employees and agents act with the consent,

17  management, approval, ratification and direction of H.I.G.

18

19      24.     H.I.G. places at least two Managing Directors and one Principal of its private

20  equity team as Board members, Chief Financial Officers, or other executive officers of

21  WELLPATH to ensure continuity of control and management over WELLPATH. These high-

22  ranking H.I.G. members include an H.I.G. Managing Director who serves as a Board Member,

23

24  an H.I.G. Principal who serves as a Chief Financial Officer and Secretary, and an H.I.G.

25  Managing Director who is intimately involved in the day-to-day management of WELLPATH.

26  H.I.G. employees are routinely appointed to WELLPATH's Board of Directors to ensure

27

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

financial control over its affairs. Additionally, they have knowledge of H.I.G.'s contractual relationship with WELLPATH and how H.I.G. employees are appointed to WELLPATH's board of directors and the duties of its board members.

25.     Before acquiring WELLPATH, H.I.G. knew of the pervasive unconstitutional conduct of the company. H.I.G. knew this and acquired this information through performing due diligence analysis prior to acquiring WELLPATH. It made the decision that providing mental health care in jails was a financially lucrative business to acquire, control and manage, and has adjusted its private equity fund investments and operational structure to capitalize on sick and mentally ill prisoners in jail systems across the Nation. H.I.G.'s use of WELLPATH is but a mere shell, an instrumentality or conduit for the business of financially profiting from providing mental/medical care to the mentally ill in jails through these shell companies.

26.     H.I.G. renamed CCS "WELLPATH" in October 2018, for the purpose of carrying H.I.G.'s ownership and financial interests in providing jail mental and medical health care and so H.I.G. controls the assets and financial gains while WELLPATH assumes the liabilities. WELLPATH is H.I.G.'s 23rd control investment in healthcare since 2008 and is its 14th current platform in the sector. WELLPATH is estimated to generate $1.5 billion for H.I.G. annually.

27.     On October 1, 2018, H.I.G. publicly announced that "[o]ver the years, as the country's health care system has changed; we have seen more and more individuals with acute mental health diagnosis and substance use disorders being treated by our doctors, nurses and clinicians in correctional settings."

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

28.     H.I.G. knew that behavioral and mental healthcare, in particular, located in state and federal correctional facilities or civil commitment centers have become repositories particularly for the vulnerable mentally ill population growing across the United States and they decided to capitalize on this vulnerable population. H.I.G. uses the corporate entity as a shield against personal liability and harm caused to the mentally ill in jails.

29.     Recognition of H.I.G. as a separate corporate entity would promote injustice and defeat the rights and equities of persons such as Mr. Bones and Plaintiffs; it would enable and facilitate continued WELLPATH and H.I.G. unconstitutional conduct, practices, customs and policies, actions and inactions that harm this particularly vulnerable jail population and discourage abatement of these unconstitutional actions and inactions.

30.     Medical care providers, employees and agents (such as H.I.G. and the companies it owns and controls/WELLPATH), employed by a government entity are state actors for 42 U.S.C. § 1983 purposes acting under color of law when providing and delivering medical services to prisoners and/or implementing policies and practices regarding provision of medical care that directly affect the day-to-day delivery of health care to prisoners and pretrial detainees. At all material times, each of H.I.G/WELLPATH supervisors, managers, or executives were responsible for the hiring, retaining, training, and supervising of the conduct, customs, policies and practices of its member employees and agents of H.I.G./WELLPATH.

31.     Defendant WELLPATH (owned by H.I.G.), on information and belief with approval of H.I.G., entered into a contract with CLALLAM COUNTY to provide for medical and mental health services of those incarcerated and detained Clallam County Jail.

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

32.     Plaintiffs allege that Defendants WELLPATH, WELLPATH EMPLOYEES, and DOES 11-20, were and are acting on behalf of Defendant H.I.G. and were and are agents of H.I.G. and therefore H.I.G. is responsible for their conduct as described in this Complaint. On information and belief, H.I.G. gave Wellpath Defendants authority to act on its behalf and thus WELLPATH, WELLPATH EMPLOYEES, and DOES 11-20 were and are H.I.G.'s agents. Each defendant was, and is, the agent of the other and at all relevant times was acting as the agent and on behalf of the other.

33.     H.I.G. exercises sufficient control over WELLPATH's activities such that WELLPATH is a mere agent or instrumentality of H.I.G.

34.     H.I.G. places its senior partner and/or members on the boards or managing bodies of WELLPATH in order to maintain a high degree of day-to-day control over WELLPATH's activities.

35.     H.I.G. acts through its employees, agents, directors, officers and is responsible for the acts of its employees, agents, directors, and officers performed within the scope of such agency. WELLPATH, WELLPATH EMPLOYEES, and DOES 11-20, were and are acting on behalf of Defendant H.I.G. and were and are agents of H.I.G. and therefore H.I.G. is responsible for their conduct as described in this complaint. For instance, WELLPATH's Secretary and Chief Financial Officer—a Principal of H.I.G.—is responsible for the financial affairs of WELLPATH. His duties involve tracking cash flow and financial planning as well as analyzing the WELLPATH'S financial strengths and weaknesses and proposing corrective actions. As Secretary, he is in charge of all the records and documentation for WELLPATH.

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

36.     H.I.G. has seats on the board of WELLPATH and controls, manages, and approves major policy decisions of WELLPATH.

37.     When WELLPATH was created by merging CCS and CMGC, Rob Wolfson, an H.I.G. Executive Managing Director, announced in a press release: "We are proud of what we have accomplished since partnering with CMGC in 2012, and are very excited to bring these two leading companies together."

38.     WELLPATH undertakes its provision of jail medical and mental health services with the understanding that H.I.G. is the principal in control of those activities, H.I.G. has authorized and in fact encouraged WELLPATH to conduct those activities in a manner that contains costs and jeopardizes the lives of individuals who have mental illnesses, and H.I.G. has or should have knowledge of all material facts about WELLPATH's actions.

39.     H.I.G. ratifies the conduct of WELLPATH by knowingly accepting the risks of jail medical services and mental health services. Despite knowledge of the unconstitutional actions and inactions causing harm to Washington's sick and mentally ill incarcerated and/or pretrial detainee vulnerable residents, WELLPATH is H.I.G.'s 23rd control investment in healthcare since 2008 and is its 14th current platform in the sector.

40.     Defendants JOHN DOES 11-20 are subcontractors, employees, and /or agents of WELLPATH. These Defendants Doe knew that Joshua was (1) suicidal; (2) in the midst of a mental health crisis; and/or (3) was housed in unconstitutional conditions of confinement. These Defendants were negligent; deliberately indifferent; and/or acted in furtherance of an official and/or de facto policy or procedure of deliberate indifference.

41.     Defendant H.I.G. is a Florida incorporated entity.

COMPLAINT FOR DAMAGES - Page 13

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

## II. JURISDICTION & VENUE

42.     The cause of action arose in the County of Clallam, State of Washington.

43.     The alleged facts, negligent acts in part, and damages alleged occurred in the County of Clallam, State of Washington.

44.     This Court has jurisdiction over the parties and subject matter of this action. Venue is proper within Jefferson County Superior Court as the cause of action arose in the nearest judicial district of the County of Clallam, State of Washington, pursuant to RCW 36.01.050.

## III. FACTS

45.     Neither jails nor their employees or subcontractors are allowed to gamble needlessly with the safety of inmates. If they do, and an inmate is injured or dies, the inmate and/or his or her family are entitled to full compensation for the harms and losses caused. Here, because defendants violated this safety rule in numerous instances, and Joshua died as a result, Plaintiffs are entitled to be compensated for the harms and losses that the Defendants have caused.

46.     Joshua was a physically healthy 38-year-old male when his life was cut short while in the care and custody of the County.

47.     Joshua was highly decorated combat veteran who was diagnosed and known by numerous Defendants—identified in more detail below—to have serious mental health conditions and a heightened risk of suicide from the time he was incarcerated until his death.

48.     On July 20, 2022, officers responded to the Bones' residence after SARAH BONES reported that Joshua was refusing to leave and had armed himself with a firearm.

COMPLAINT FOR DAMAGES - Page 14

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

49.     When officers arrived, Sarah informed them that she had asked him to leave the previous day due to his increasingly bizarre behavior.  Joshua refused and informed her that if she wanted him gone, she would need to call the cops.

50.     Based on Sarah's reports, Officers applied an Extreme Risk Protection Order ("ERPO"), pursuant to RCW 7.105.215, to seize any firearms or dangerous weapons from Joshua's possession. According to the ERPO Petition:

(CCHO CFS# 2022-13103) On 7/19/2022 Joshua Pozgay went to his estranged wife Sara Bones' residence at 52 Soaring Hawk Ln west of Sequim in Clallam County where Sarah resides with her two teenaged sons. Joshua told Sarah he was not leaving and she would have to call the cops. Joshua stayed the night and on the morning of 7/20/2022 Joshua asked Sarah if she had called the cops on him yet. Sarah did not want to call the cops. Sarah noticed Joshua had his 9mm pistol out and on the table next to him. Sarah put her two teenaged sons on the bus to stay at her sisters in Port Angeles then returned home.  Joshua was still there, sitting on the couch with the gun still out on the table. Joshua told Sarah if she did not call the cops he was going to shoot her music box. Sarah left the residence and called 911. Joshua and Sarah are separated but not divorced.  Joshua had been living at the home with Sarah until she asked him to leave in early June 2022. Sarah is concerned that Joshua is planning Suicide by Cop. Sarah said Joshua made a pact that he would never commit suicide however he recently told Sarah he wished he had never made that promise and had asked Sarah to do it for him. Sarah also told that in June (unsure of date) Joshua had come over and he had been stabbed. Joshua did not report it and told Sarah he was drunk and had been messing around with friends and got stabbed. Sarah convinced Joshua to seek medical attention which he did two days later at OMC where he had to have surgery.

51.     The following day, July 21, 2022, two officers arrived at the Bones' residence and attempted to serve the ERPO, which was granted, and arrested him on an outstanding bench warrant. They contacted Joshua and spoke to him for over two hours, attempting to gain his cooperation and take him into custody on the warrant.

52.     Eventually Joshua became angry and told officers that he was not going to jail, punched the table, stood up, and stated "Okay, I'm just going to do it!" He then turned his back to officers, reached for a handgun in his waistband, and cocked it. However, before Joshua was

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

able to commit suicide, Sargent Minks of the Clallam County Sheriff's Department deployed his taser, striking Joshua, who was eventually taken into custody.

53.     Joshua was subsequently transported and booked into the Clallam County Jail at 3:00 PM on July 21, 2022.  As part of the administrative booking process, DEFENDANT CORTANI conducted an initial classification of Joshua, and an Inmate Daily Multi-Purpose Log ("IDMPL") was created for Joshua.

54.     The IDMPL correctly indicated that Joshua "**ATTEMPTED SUICIDE DURING ARREST**":

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

55.     Although "**ATTEMPTED SUICIDE DURING ARREST**" was clearly indicated on the IDMPL, little, if any restrictions were placed on Joshua's activities or the jail-issued items he was given. Joshua was not provided a suicide blanket and a suicide smock. Instead, he was given access to regular bedding and clothing. Moreover, he was permitted to move throughout the Jail normally and was not placed on "Safety/Mental Watch," as DEFENDANT CORTANI failed to check any of the five boxes designating Joshua's placement. Finally, the IDMPL was never reviewed by either a Mental Health Professional or a Supervisor.

56.     Had DEFENDANT CORTANI taken appropriate measures or exercised any professional judgment at all, Joshua would have been kept safe and alive. In other words, DEFENDANT CORTANI'S acts or omissions set in place a series of events that put Joshua at an increased risk of harm that would have not existed had DEFENDANT CORTANI taken the appropriate measure and/or exercised professional judgment.

57.     On August 10, 2022, Joshua was diagnosed with a "severe" Substance Use Disorder ("SUD"), by DEFENDANT RUBALCAVA, an employee of Defendant WELLPATH and a Substance Use Disorder Professional ("SUDP") and Jail subcontractor. DEFENDANT RUBALCAVA noted that Josh was taking Prozac at the time of the evaluation and he had the pre-existing mental health diagnoses of Post-Traumatic Stress Disorder ("PTSD"), Paranoia, and Traumatic Brain Injury. Joshua's medical records also indicate the diagnoses of Major Depressive Disorder, and Anxiety Disorder.

58.     DEFENDANT RUBALCAVA also noted that Joshua answered "yes" to the following questions: 1.) Do you or have you had thoughts of hurting yourself? ; 2.) Have you

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

had thoughts that you would be better off dead?; and 3.) *if yes* Are you having those thoughts today?" Despite this information and all of the evidence to the contrary, DEFENDANT RUBALCAVA concluded that Joshua only had "mild" emotional, behavioral, or cognitive conditions. Joshua's increased suicide risk and serious mental illnesses were untreated for the next four months. Had DEFENDANT RUBALCAVA taken the clinically appropriate measures or exercised any professional judgment at all, Joshua would have been kept safe and alive. In other words, DEFENDANT RUBALCAVA acts or omissions set in place a series of events that put Joshua at an increased risk of harm that would have not existed had DEFENDANT RUBALCAVA taken the clinically appropriate measure and/or exercised professional judgment.

59.     On August 1, 2022, Joshua was prescribed Prozac by DEFENDANT PUHL after reporting that he was "having intrusive thoughts of self-hatred."

60.     Five weeks later, on September 7, 2023, Joshua was seen by DEFENDANT BERRETTA for a follow up appointment. Josh reported "ill effects of SSRIs." DEFENDANT BERRETTA recommend Joshua try something new in three weeks and in the meantime, he advised Joshua to begin tapering off the Prozac.

61.     Six days later, on September 13, 2022, Joshua was seen by DEFENDANT MONAHAN and reported suffering from "dizziness, weird sensation of head 'waving,' and feeling grounded in his body since starting setraline [Prozac]." DEFENDANT MONAHAN recommended Joshua discontinue Prozac altogether, immediately start Escitalopram [Lexapro], and follow-up with medical staff in four weeks.

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

62.     A week later, on September 20, 2022, Joshua was again seen by DEFENDANT MONAHAN for a mental health follow-up and reported the same issues with SSRIs.   He also disclosed a "40%" PTSD disability from the VA, as well as the fact that he was "the only member of [my] unit from Iraq that hasn't committed suicide."

63.     On October 31, 2022, Joshua was seen by DEFENDANT LONG, an employee of DEFENDANT WELLPATH, and "requested to have all medications discontinued." DEFENDANT LONG advised him against this, provided him with "medication education," and encouraged him to follow-up with DEFENDANT VANOVER.

64.     Later that day, Joshua met with DEFENDANT VANOVER and reaffirmed that "he would like to discontinue medication as it makes him 'dopey.'"   DEFENDANT VANOVER "encouraged him to discuss medication regimen with [a] doctor as [it] appears to be helping treat his anxiety/depression."

65.     On November 4, 2022, Josh was seen by DEFENDANT JONES for a follow-up appointment and reported feeling "great." Nevertheless, DEFENDANT JONES encouraged him "to report any change in mental state to RNs/staff for support." At the very least, this suggests that Defendant Jones knew of the risks associated discontinuing SSRIs and rather than notifying Jail staff, she instead just sent him back to "C tank."

66.     Despite the well-known risks that suddenly discontinuing SSRIs can cause increased risk of relapse, a worsening of symptoms, and an increased suicide risk, DEFENDANTS PUHL; BERRETTA; MONAHAN; LONG; VANOVER; and JONES all failed to take the clinically appropriate measures or exercise any professional judgment at all. Had they done so, Joshua would have been kept safe and alive. In other words, DEFENDANTS

COMPLAINT FOR DAMAGES - Page 19

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

PUHL; BERRETTA; MONAHAN; LONG; VANOVER; and LONG individual and/or combined acts or omissions set in place a series of events that put Joshua at an increased risk of harm that would have not existed had DEFENDANTS PUHL; BERRETTA; MONAHAN; LONG; VANOVER; and LONG taken the clinically appropriate measure and/or exercised professional judgment.

67.    Corrections officials fail to provide for the reasonable safety of inmates when they ignore a strong likelihood that a condition of confinement will contribute substantially to serious injury Here, Defendants failed to eliminate from its jail cells a convenient and inviting tool for committing suicide, an easily accessible tie-off point between the windows and their frames:



It is well known and understood by reasonably prudent jail administrators and operators that because most inmates commit suicide by hanging using bedding, shoelaces, or clothing correctional facilities should create a suicide-safe environment, which is a cell or dormitory that has eliminated or minimized hanging points and unsupervised access to lethal materials

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

for inmates at an increased risk of suicide. These tie-off points presented an open initiation to at-risk inmates akin to pouring gasoline on a fire.

68.     In sum, it was well known by 2022 that Joshua was at a heightened risk of suicide because he had previous "suicide attempts" and "suicidal ideations," was seriously mentally ill, and was discontinuing SSRIs—and that his increased risk would persist indefinitely without treatment. It was also well known that the cell that Joshua was finally housed in was equipped with features that were substantially likely to be used to commit suicide.

69.     Joshua spent a total of 156 days (5 months) languishing in pre-trial detention— anxiously awaiting a resolution to his criminal case. This no doubt led to feelings of hopelessness which were only compounded by several unsuccessful attempts by his public defender to secure a furlough to in-patient treatment; the last unsuccessful attempt occurred on October 11, 2022. Twenty days later, Joshua suddenly stopped taking SSRIs altogether, and was not provided increased medical or mental health monitoring.

70.     Many of the people who spend time in custody will require mental health care and treatment, including suicide prevention services. Because they are incarcerated, and not free to leave the facility to obtain such care on their own, those who operate corrections facilities have an obligation to provide any and all reasonably necessary medical and psychiatric care and treatment, and to keep those in their care and protection safe from harm, including self-inflicted harm.

71.     This obligation is known and understood by reasonably prudent jail administrators and operators. In Washington, it is known and understood by reasonably

COMPLAINT FOR DAMAGES - Page 21

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

prudent jail administrators and operators that the quality of medical care and protection must be the same as what would be provided in the outside community.

25.     Defendants had knowledge of, yet failed to address or treat, (1) Joshua's serious mental health condition, and (2) Joshua's heightened suicide risk.

26.     Defendants failed to properly screen Josh at the time of his intake, and they failed to conduct regular screening throughout his incarceration, or during the critical periods identified by the World Health Organization.

27. Although suicide is a known problem amongst jail and prison inmates, Defendants failed to have or follow proper policies for suicide screening and prevention.

28.     Joshua's death was completely unnecessary and could have been easily prevented *via* provision of even the most basic medical care and treatment.

29.     In addition, policymaking Defendants have maintained policies, customs, and procedures that were unconstitutional and fell far below the quality of care known and understood by reasonable and prudent jail administrators and operators in the Defendants have, for example:

    a.   failure to adequately train officers and employees in suicide prevention;
    b.   failure to train officers and employees in suicide prevention policies and procedures;
    c.   failure to train officers and employees to properly monitor and to protect inmates;
    d.   failure to train officers and employees to properly identify and monitor at-risk inmates;
    e.   failure to train officers and employees to detect dangerous items on inmates' person and in cells;
    f.   failure to train officers and employees in in-take procedure;

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

g.  failure to enforce policies and procedures for suicide prevention, including but not limited to, policies and procedures for inmate in-take, confiscation of dangerous items from inmates, and monitoring of inmates.

h.  caused, permitted, and allowed a custom and practice of continued and persistent deviations from policies and procedures;

i.  maintained inadequate suicide prevention policies and procedures which, failed to identify and/or monitor at risk detainees;

j.  maintained inadequate in-take policies and procedures, which failed to identify at-risk detainees, permitted dangerous items to remain with detainees, and failed to identify and monitor prescription medication;

k.  maintained inadequate monitoring system of inmates;

l.  maintained a policy of placing inmates into a remote cell without adequate review by mental health provider prior to such placement;

m.  *failed to create systems of information sharing, communication, and clearly delineated roles and lines of authority*;

n.  failed to provide sufficient resources to provide for the necessary medical care for mentally ill inmates;

o.  maintained a policy of ignoring inmate requests for mental health care, medication, and help with depression and self-harm;

p.  maintained a policy of using cursory mental health and suicide screening that essentially amounted to no screening at all for incoming inmates;

q.  maintained a policy of not regularly monitoring inmates;

r.  maintained a policy of ignoring and refusing to implement relatively inexpensive suicide prevention measures;

s.  maintained a policy of underfunding that resulted in understaffing, and inability to implement additional suicide precautions, and undertraining;

t.  failed to adequately staff the jail facility; and

u.  maintained a policy of knowingly furnishing detainees with items that are substantially likely to be used to commit suicide.

COMPLAINT FOR DAMAGES - Page 23

All of which amounts to negligence and deliberate indifference to the known and/or obvious risk of suicide and serious medical and safety needs of at-risk detainees, including Joshua.

30.     Rather than being forced to endure another hopeless day in pre-trial detention, Joshua took his own life.

31.     DEFENDANTS   WATERHOUSE;   MORGAN;   DAHL;   CAMERON; ANDREWS; MCCANN;  LIM; ROMAN; CLERICI; BROOKS; HEINER; WOOLMAN; COOPER;  ALEXANDER;  HUNTINGTON;  SCHULTZ;  ARAND;  BRAY;  JANISSE; MORGAN;  PENCE;  RAEMER;WESSEL;  NEWHOUSE;  MONTEZ;  MILDON;  GRALL; MARTIN;  CORTANI;  PENCE;  WALKUP; CLARK; COOPER; BERNSTEN; PRICE; and WAKNITZ allowed this to happen by failing to render aid to Joshua and/or negligently rendering aid to Joshua.

32.     Jail employees deliberately did not follow official policies and standards, which evidences their deliberate indifference and negligence. *See Salter v. Booker,* No. 12-0285, 2016 WL 3645196, at *12 (D.D. Ala. June 29, 2016) ("Defendants acted with deliberate indifference when they failed to enforce or follow the written jail policies and procedures put in place to protect suicidal prisoners.").

33.     In addition, Policymaking DEFENDANTS were deliberately indifferent and negligent in their failure to implement these and other standards and policies and/or train, supervise, fund, staff, and/or control Jail employees in this regard.

34.     DEFENDANTS are not even trying; they have been negligent, grossly negligent, and have showed deliberate indifference to medical and safety needs of inmates at the Clallam County Jail. It also includes a cold-hearted attitude on the part of staff, who ignore

COMPLAINT FOR DAMAGES - Page 24

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

safety harms as they present and who turn a blind eye and deaf ear to people who have serious

mental health and safety needs.

35.    Although suicide is a known problem amongst jail and prison inmates,

Defendants failed to have or follow proper polices for suicide screening and prevention.

36.    Each and every individually named DEFENDANT had knowledge that a

substantial risk of serious harm existed as to Joshua's suicidality. And, Policymaking

DEFENDANTS had knowledge that their policies, customs, and/or protocols created a

substantial risk of serious harm as to Joshua's suicidality. But even if these DEFENDANTS

did not have knowledge of the risk of harm as to the risk created by their policies, customs,

and/or protocols – and lack thereof/lack of training thereon/lack of funding to implement – was

obvious in light of reason and the basic general knowledge that Policymaking DEFENDANTS

are presumed to have obtained regarding the type of deprivation involved.

37.    The claims of PLAINTIFFS herein, and the related injuries and damages, were

the proximate result of the acts and omissions caused by DEFENDANTS through their

policies, practices, customs – including but not limited to: inadequate staffing; training;

preparation; procedures; supervision; and discipline.

38.    The aforesaid acts and omissions of Defendants deprived Joshua of his right to

be free from punishment and to due process of the law as guaranteed by the Fourteenth

Amendment of the United States Constitution; directly caused and/or directly contributed to

his pain, suffering, and a general decline of his quality of life; directly caused and/or directly

contributed to cause his death; directly caused and/or directly contributed to caused his family

to suffer loss of services, companionship, comfort, instruction, guidance, counsel, training, and

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

support; and directly caused and/or directly contributed to cause his family to suffer pecuniary losses, including but not limited to medical and funeral expenses.

39.   Prior to death, Joshua suffered extreme physical and mental pain, terror, anxiety, suffering, and emotional distress.

40.   Joshua's death was completely unnecessary and could have been easily prevented.

## IV. FIRST CAUSE OF ACTION –NEGLIGENCE

41.   DEFENDANTS had a duty to care of inmates and provide reasonable safety and medical and psychiatric care. This duty was nondelegable.

42.   This duty extends to foreseeable self-inflicted harms and includes protecting inmates against suicide.

43.   This duty exists because prisoners, by virtue of incarceration, are unable to obtain medical and psychiatric care and police protection for themselves.

44.   DEFENDANTS breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the assessment of persons with apparent medical and psychiatric needs.

45.   DEFENDANTS breached this duty, and were negligent, when they failed to adequately treat Joshua's medical and psychiatric needs.

46.   DEFENDANTS breached this duty, and were negligent, when they failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical and psychiatric care and treatment to inmates.

COMPLAINT FOR DAMAGES - Page 26

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

47.     DEFENDANTS breached this duty, and were negligent, when they failed to ensure that Joshua was properly supervised and/or that cell checks were conducted in a safe and consistent manner.

48.     DEFENDANTS breached this duty, and were negligent, when they failed to ensure that Joshua received adequate medication.

49.     DEFENDANTS breached this duty, and were negligent, when they ignored Joshua's serious mental health condition and suicidality.

50.     DEFENDANTS breached this duty, and were negligent, when they failed to properly assess and treat Joshua prior to his death.

51.     DEFENDANTS breached this duty, and were negligent, when they furnished Joshua with items that are substantially likely to be used to commit suicide (accessible tie-off point in the window frame and bedding that could easily be transformed into a noose).

52.     As a direct and proximate result of the breaches, failures, and negligence of DEFENDANTS, as described above and in other respects as well, Joshua was allowed to take his own life. He also suffered unimaginable pre-death suffering and despair.

53.     As a direct and proximate result of the breaches, failures, and negligence of DEFENDANTS as described above and in other respects as well, PLAINTIFFS have incurred and will continue to incur general and special damages in an amount to be proven at trial.

54.     When a special relationship forms between jailor and inmate, sparking a duty for the jailor to protect the inmate from self-inflicted harm, physical harm, and safety from other inmates, the defenses of assumption of risk and contributory negligence are inappropriate.

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

## V. SECOND CAUSE OF ACTION –42 U.S.C. § 1983

55.     The acts and failure to act described above were done under color of law and are in violation of 42 U.S. C. § 1983, depriving PLAINTIFF SARAH BONES; JOSHUA BONES;  C.G.; and T.G. of their constitutionally protected rights.

56.     At the time of Joshua's death, it was clearly established in the law the Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of the inmates. The Fourteenth Amendment extends at least as much protection to pretrial detainees like Joshua. "[W]hile the convicted prisoner is entitled to protection only against punishment that is 'cruel and unusual,' the pretrial detainee, who has yet to be adjudicated guilty of any crime, may not be subjected to any form of 'punishment.' " *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir.1988) Pretrial detainees have a clearly established right to "medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir.1992).

57.     Having untreated or inadequately treated mental illness and suicidality is not part of the penalty that criminal offenders pay for their offenses against society. As a result, jail officials are liable if they know that an inmate or inmates face a substantial risk of serious harm and disregard that risk by failing to take reasonable measures to abate it.

58.     Here, individually named DEFENDANTS knew that Joshua faced a substantial risk of suicide, yet disregarded that risk by failing to take reasonable measures to abate it.

COMPLAINT FOR DAMAGES - Page 28

59.    Here, individually named DEFENDANTS knew that Joshua was facing serious mental illness, yet disregarded that risk by failing to take reasonable measures to abate it.

60.    Here, Policymaking individually named DEFENDANTS knew of and disregarded the excessive risk to inmate health and safety caused by Clallam County's informal policies.

61.    Policymaking individually named DEFENDANTS were responsible for a policy, practice, or custom of maintaining a longstanding constitutionally deficient safety and medical and mental health care, and training thereon, which placed inmates like Joshua at substantial risk.

62.    There was little to no supervision of Joshua and inmates like him, because Policymaking individually named DEFENDANTS maintained a known policy and custom of understaffing and overcrowding.

63.    Policymaking individually named DEFENDANTS' lack of clear delineation of authority and inadequate means of communication with respect to assessing risks of suicide was an additional policy that caused the individual defendants' failure to prevent Joshua's pain, suffering, and death. In essence, there is a "who's on first" problem at Clallam County Jail where the differing facilities and personnel employed therein have policies of non-communication to one another or amongst themselves in regard to inmate suicidality and safety.

64.    Individually named DEFENDANTS were subjectively aware that Joshua was suffering from mental illness and was suicidal.  From this evidence, a reasonable jailer and/or healthcare provider would have been compelled to infer that a substantial risk of serious harm

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

existed. Indeed, individually named DEFENDANTS did infer that a substantial risk of serious harm existed, but failed to take any steps to alleviate this risk. And Joshua died as a result.

65.     As a direct and proximate result of the deliberate indifference of DEFENDANTS, as described above and in other respects as well, Joshua died a terrible and easily preventable death. He suffered pre-death pain, anxiety, and despair, before being asphyxiated and leaving behind a loving family.

66.     As a direct and proximate result of the deliberate indifference of DEFENDANTS, PLAINTIFF SARAH BONES has suffered the loss of her husband, and PLAINTIFFS C.G., and T.G. have suffered the loss of the only father they knew, in violation of their Fourteenth Amendment rights. PLAINTIFFS have suffered and continue to suffer extreme grief and harm due to mental and emotional distress as a result of Joshua's wrongful death.

67.     Individually named DEFENDANTS have shown reckless and careless disregard and indifference to inmates' rights and safety, and are therefore subject to an award of punitive damages to deter such conduct in the future.

### VI. THIRD CAUSE OF ACTION –42 U.S.C. § 1983
Unconstitutional Policy, Custom, or Procedure (*Monell*)
By Plaintiff Against Defendant County

68.     Plaintiff incorporates all paragraphs, as though fully set forth herein.

69.     This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a deprivation under color of law of a right, privilege, or immunity secured to them by the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**SCHODOWSKI LAW INC. PS**
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

70.     Municipal liability can attach under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for even a single decision made by a final policymaker in certain circumstances, regardless of whether or not the action is taken once or repeatedly. See *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986). If an authorized policymaker approves a subordinate's decision and the basis for it, such ratification would be chargeable to the municipality under *Monell*. See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

71.     Defendant County violated Joshua's constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, described above.

## VI. JURY DEMAND

72.     Plaintiffs hereby demand a jury.

## VII. PRAYER FOR RELIEF

73.     Damages have been suffered by PLAINTIFFS and to the extent any state law limitations on such damages are purposed to exist, they are inconsistent with the compensatory, remedial and/or punitive purposes of 42 U. S. C. § 1983, and therefore any such alleged state law limitations must be disregarded in favor of permitting an award of the damages prayed for herein.

74.     WHEREFORE, PLAINTIFFS pray for damages against all DEFENDANTS, as follows:

(a) Fashioning an appropriate remedy and awarding general, special, and punitiave damages, including damages for pain, suffering, terror, loss of consortium, and loss of familial

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035

relations, and loss of society and companionship under Washington State law and pursuant to 42 U.S.C. § 1983 and 1988, in an amount to be proven at trial;

(b) Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, or as otherwise available under the law;

(c) Declaring the defendants jointly and severally liable;

(d) Awarding any an all applicable interest on the judgment; and

(e) Awarding such other and further relief as the Court deems just and proper.

DATED this 8th day of January, 2024.

SCHODOWSKI LAW INC. PS

Joseph Schodowski, WSBA #42910
Of Attorneys for Plaintiff

GALANDA BROADMAN, PLLC

Ryan D. Dreveskracht, WSBA #42593
Of Attorneys for Plaintiff

COMPLAINT FOR DAMAGES - Page 32

SCHODOWSKI LAW INC. PS
210 Polk Street, Suite 8
Port Townsend, Washington 98368
Tel: (360) 821-8873 / Fax: (888) 474-1035